STATE EX REL. KURKIEREWICZ, Respondent, v. CANNON, District Attorney, Appellant.*

*No. 185. Argued March 5, 1969.—Decided April 4, 1969.*
(Also reported in 166 N. W. 2d 255.)

* Motion for rehearing denied, with costs, on June 3, 1969.

370

372

For the appellant there were briefs by *Robert P. Russell,* corporation counsel of Milwaukee county, and *James J. O'Donnell,* deputy corporation counsel, and oral argument by *Mr. O'Donnell.*

For the respondent there was a brief and oral argument by *Ross R. Kinney* of Milwaukee.

HEFFERNAN, J. The defendant, district attorney, moved to quash the alternative writ. It is conceded by the parties to this action that a motion to quash the writ is deemed a demurrer and admits the facts appearing in the petition. Sec. 293.01, Stats.; *State ex rel. Nelson v. Henry* (1934), 216 Wis. 80, 256 N. W. 714; *Walter Laev, Inc. v. Karns* (1968), 40 Wis. 2d 114, 161 N. W. 2d 227.

The following facts are alleged in the petition of Marcella Kurkierewicz: In April, 1968, her eighteen-year-old son, Jerome, was killed as a result of being shot twice, once in the head and once in the chest, by Patrolman William J. Miller of the St. Francis police station. Just prior to the shooting, when Jerome, Officers Miller, Bronstad, and Ast were in an interrogation room, Jerome pulled out a round-tipped table knife with a serrated edge. He began slashing out at Officer Ast and drove him through the door of the interrogation room into a fingerprinting room. He did not strike Officer Ast with the knife. He then went after Officers Miller and Bronstad, who backed up to or through a door. He slashed at them with his knife but did not strike either one of them. At this point, Officer Miller shot Jerome in the head and chest. The district attorney talked with the officers involved about this matter. At this meeting, Officer Ast said that Miller and Bronstad did not drop to the floor to try to trip the deceased, did not throw the dispenser or the logbook at the deceased, and did not back

through the door into the city hall area in order to attempt to seize the deceased if he came through the door. Officer Ast did not know why these actions were not taken. Officer Miller said that he shot the deceased because there was no place else he and Officer Bronstad could have gone. He did not know why he shot the deceased twice. Officer Miller knew deceased prior to the shooting and had had trouble with him before. Moreover, Officer Miller is a defendant in a pending action brought by Leonard Symkowski, who claims Miller pistol-whipped him.

Marcella Kurkierewicz, through her attorney, asked the district attorney of Milwaukee to order an inquest to investigate the circumstances surrounding the death of her son and asked the coroner of Milwaukee county, Dr. Helen Young, to hold an inquest. Both refused to do so.

On the basis of the facts set out in the petition, Marcella Kurkierewicz argues that she is entitled to a writ of mandamus directing the district attorney to order an inquest in accordance with sec. 966.01, Stats., which provides in part as follows:

"Whenever the district attorney has notice of the death of any person and from the circumstances surrounding the same there is any reason to believe that murder, manslaughter, homicide resulting from negligent control of vicious animal, homicide by reckless conduct, homicide by negligent use of vehicle or firearm, or homicide by intoxicated user of vehicle or firearm may have been committed, or that death may have been due to . . . unexplained or suspicious circumstances . . . he shall forthwith order and require the coroner . . . to take an inquest as to how such person came to his death."

On the facts, after considering the petition and the supplementary affidavit of the district attorney, the circuit judge granted the peremptory writ. A writ of mandamus is a discretionary writ in that it lies within the sound discretion of the trial judge either to grant or deny it. Hence, the action of a trial judge in either

granting or denying the writ will be affirmed unless the trial judge abused his discretion. *Menzl v. Milwaukee* (1966), 32 Wis. 2d 266, 275, 145 N. W. 2d 198; *State ex rel. New Strand Theatre Co. v. Common Council* (1930), 201 Wis. 423, 425, 230 N. W. 60. As a corollary, it follows that if mandamus is not a proper remedy to direct the district attorney to order an inquest, a writ of mandamus that so directs is the result of an abuse of discretion.

A writ of mandamus will lie to compel public officers to perform their prescribed statutory duties. *State ex rel. Martin v. Zimmerman* (1939), 233 Wis. 16, 288 N. W. 454; *State ex rel. Ingold v. Mayor* (1919), 170 Wis. 133, 174 N. W. 471; *State ex rel. McKay v. Curtis* (1907), 130 Wis. 357, 110 N. W. 189. Mandamus, however, is an extraordinary remedy and will not lie if there is another adequate and specific remedy at law (*Underwood v. Karns* (1963), 21 Wis. 2d 175, 124 N. W. 2d 116), or if the act lies entirely within the discretion of the officer.

". . . it is an abuse of discretion for a court to compel action through mandamus when the officer's duty is not clear and unequivocal and requires the exercise of the officer's discretion." *Menzl v. Milwaukee, supra,* p. 276.

During oral argument it was suggested that a John Doe proceeding, outlined in sec. 954.025, Stats., would have afforded the petitioner the relief she sought and that, therefore, mandamus should not lie. A John Doe proceeding could possibly afford the relief sought by the petitioner. The John Doe, as well as the coroner's inquest, is primarily an investigative device, out of which can come either an exoneration, by implication at least, or a formal charge of a crime. We conclude, however, that the John Doe would not assure the investigation sought by petitioner. Sec. 954.025 requires that the petitioner must complain to the magistrate "that he has reason to believe a crime has been committed." Marcella Kurkierewicz made no allegation of the commission of a crime in her petition for mandamus. The strongest

statement of her state of mind in this regard is reflected in the memorandum of the circuit judge in which there appears the statement, "His mother . . . aggrieved by the death of her son and beset by doubts as to whether the shooting of her son was justified . . . ." This is far from being able to swear to a magistrate that she had reason to believe a crime had been committed.

Moreover, what Marcella Kurkierewicz sought was a public investigation that would either allay her doubts or confirm her fears. A John Doe would not do that, for it may be held in secret and the statute itself leaves even the nature of the investigation to the complete discretion of the magistrate. Sec. 954.025, Stats., provides, in part: "The extent to which the magistrate may proceed in such examination is within his discretion." Hence, no greater obligation than merely hearing the complainant and her witnesses is imposed on the magistrate. Only at the request of the district attorney, and subject to the discretion of the magistrate, may other witnesses be subpoenaed and examined.

We are satisfied that John Doe is a feeble investigative device indeed, unless both the district attorney and the magistrate are amenable to using their offices in furtherance of the investigation. A John Doe would not necessarily provide the relief sought by the petitioner, and hence we cannot say that there is a remedy other than mandamus which is competent to afford relief on the same subject matter and is both adequate and specific. *See State ex rel. Racine County v. Schmidt* (1959), 7 Wis. 2d 528, 536, 97 N. W. 2d 493; *State ex rel. Sheboygan County v. Telgener* (1929), 199 Wis. 523, 227 N. W. 35.

We are not satisfied, however, that the act that the mandamus seeks to have performed—the calling of an inquest—is a plain and imperative duty under the facts alleged in the petition and admitted by the motion to quash. The duty of a public officer to act must be clear

and unequivocal and, under the facts, the responsibility to act must be imperative.

The district attorney in Wisconsin is a constitutional officer and is endowed with a discretion that approaches the quasi-judicial. *State v. Peterson* (1928), 195 Wis. 351, 359, 218 N. W. 367.

It is clear that in his functions as a prosecutor he has great discretion in determining whether or not to prosecute. There is no obligation or duty upon a district attorney to prosecute all complaints that may be filed with him. While it is his duty to prosecute criminals, it is obvious that a great portion of the power of the state has been placed in his hands for him to use in the furtherance of justice, and this does not per se require prosecution in all cases where there appears to be a violation of the law no matter how trivial.[2] In general, the district attorney is not answerable to any other officer of the state in respect to the manner in which he exercises those powers. True, he is answerable to the people, for if he fails in his trust he can be recalled or defeated at the polls. In the event he wilfully fails to perform his duties or is involved in crime, he may be suspended from office by the governor and removed for cause. These, however,

---

[2] "I like to think of district attorneys as belonging to the department of justice, and that they are more than prosecuting officials. They exercise a wide discretion as to what offenders shall be proceeded against and in naming the offense to be charged. This discretion requires the utmost good faith on their part and the application of that degree of wisdom usually designated by the term 'common sense.'

"It is frequently said by certain altruistic persons that the law should be strictly enforced and for any infraction thereof punishment must be swift and sure. However, men of practical experience in life recognize that no such ideal, if it be an ideal, is possible. The public officials having to deal with crime must winnow and sift from the offenders those who are the most guilty —those having the guilty intent—for vigorous prosecution." *Address of Justice Charles H. Crownhart* delivered at District Attorneys' Convention in May 1927, 16 Op. Atty. Gen. (1927) xlix.

are political remedies that go not to directing the performance of specific duties but rather go to the question of fitness for office.

The district attorney's function, in general, is of a discretionary type, the performance of which is not compellable in mandamus. 27 C. J. S., p. 648, sec. 10, *District and Prosecuting Attorneys,* summarizes, correctly we believe, the broad nature of the discretion conferred upon the district attorney:

"The prosecuting attorney has wide discretion in the manner in which his duty shall be performed, and such discretion cannot be interfered with by the courts unless he is proceeding, or is about to proceed, without or in excess of jurisdiction. Thus, except as ordained by law, in the performance of official acts he may use his own discretion without obligation to follow the judgment of others who may offer suggestions; and his conclusions in the discharge of his official liabilities and responsibilities are not in any wise subservient to the views of the judge as to the handling of the state's case."

Yet, where the legislature has spoken and directed the performance of duties under particular facts, the district attorney is obligated to comply with the legislative mandate. Only if the direction of the legislature transgresses a constitutional prohibition will the courts conclude that the district attorney's prerogatives in the judicial system supersede his obligation to the representatives of the people.

In *State v. Coubal* (1946), 248 Wis. 247, 21 N. W. 2d 381, this court discussed the nature of prosecutorial discretion in relationship to the expressed will of the legislature. *Coubal* involved the interpretation of sec. 176.90 (2), Stats., which required the district attorney to commence within ten days proceedings to revoke tavern licenses of establishments whose licensees permitted gambling devices on the premises. In the event proceedings were not commenced within the ten-day period, the district attorney was obliged to report to the attorney

general why such action had not been commenced. The court pointed out, at page 257:

"It is true that the district attorney is a *quasi*-judicial officer. This court has so held in the sense that it is his duty to administer justice rather than to obtain convictions. . . . there are many instances in the performance of his duty in which he may be called upon to exercise discretion. All his duties are not ministerial. There is, however, no basis for holding that his duties in representing the state are not subordinate to legislative direction as to the cases in which he shall proceed."

The court concluded that the position of district attorney, though constitutional, was not one of inherent powers, but was answerable to specific directions of the legislature. It appears settled, therefore, in Wisconsin at least, that the prosecutor is subject to the enactments of the legislature. For example, sec. 955.17, Stats., requires a district attorney to state in writing his reasons for not filing an information against one who has been bound over for trial. If those reasons satisfy the judge, he endorses "approved" upon the statement, but if the judge finds the reasons insufficient the district attorney is obliged to file the information and bring the case to trial.

While it is thus apparent that the district attorney is invested with great discretion and in the usual case can manage his office free from the overseership of the courts or the legislature, it is equally clear that the legislature may, if it desires, spell out the limits of the district attorney's discretion and can define the situations that will compel him to act in the performance of his legislatively prescribed duties.

We conceive sec. 966.01, Stats., to be such a legislative directive. It provides that a district attorney, having notice of a death, shall order an inquest if, from the surrounding circumstances, there is any reason to believe that death was caused by criminal conduct, suicide, or unexplained and suspicious circumstances.

As we view this statute, there is but one prerequisite to the triggering of the district attorney's duty to order an inquest—that there be "any reason to believe" that death was caused by criminal conduct amounting to homicide in some degree or by unexplained or suspicious circumstances. Once the facts show that there is any reason to believe that death was the result of a criminal act, the district attorney has no discretion to refuse to order an inquest. Sec. 966.01, Stats., states, ". . . he shall forthwith order and require the coroner . . . to take an inquest as to how such person came to his death."

But the question remains—in whose eyes or by whose mental processes is the determination to be made that an acknowledged fact will lead to the inference that there is "reason to believe." Who is to be the believer? Is this an objective standard of the reasonable man or is the standard to be applied the subjective inference of the district attorney acting within the bounds of discretion. We believe it to be the latter.

It was clear at the common law that the coroner was in his discretion to judge whether or not there should be an inquest of the dead. The modern cases determining the necessity for an inquest are few in number, and generally they arise out of claims for fees. Typical of these is *Lancaster County v. Holyoke* (1893), 37 Neb. 328, 55 N. W. 950. The statute in that case was mandatory in tenor, requiring an inquest "when the Coroner shall have been notified of the finding of the dead body of a person supposed to have died by unlawful means." (p. 330.)

The court, at page 331, held that this conferred discretion upon the coroner:

"It appears from this statute, then, that in order for a coroner to act at all . . . . *he* must have reached the conclusion that the person came to his death by unlawful means; otherwise, he has nothing to do with the dead body. The statute does not provide on what notice or information the coroner may act, or what notice or

information is sufficient . . . . doubtless that is a matter to be exercised by him in an honest and faithful manner, and he is invested, by virtue of his office, with the discretion to determine for himself whether he should or should not hold an inquest." (Emphasis supplied.)

The Missouri Supreme Court, in speaking of the coroner's discretion, stated:

"When called upon to act, he will decline or proceed to the investigation accordingly as the circumstances of the particular case are, or are not, of such a suspicious character as to render proper an official examination, and of these he is the sole judge." *Boisliniere v. Board of County Commissioners* (1862), 32 Mo. 375, 378.

McMahon, *A Practical Guide to the Coroner* (Montreal, 1907), traces the common-law rights and duties of the coroner from the time of the Magna Carta.[3] It discusses the right of the Court of King's Bench to issue a writ of mandamus to the coroner to inquire into a death and cites the case of *Hull, Coroner,* 9 Q. B. D. 689, for the proposition, "that the Coroner had not a right to refuse to enquire in the matter of a death . . . ." McMahon then points out that this rule is limited by the discretion of the coroner:

". . . this Writ is only with the object of requesting the Coroner to come and give the reasons why he has not enquired into a death. Such a Writ could not be followed by an order of the Court enjoining the Coroner to proceed with the inquest when he has shown the Court that he enquired as to the facts, and that after investigation, he exercised the discretionary power given him . . . of not assembling a jury. So it was judged in a case ex

[3] "This obligation [to hold inquests of the dead] is imposed by Magna Charta: 'Nullus liber homo aliquo modo destruatur nisi per legale judicium parium suorum aut per legem terrae.' 'No freeman shall perish in any way whatsoever but on the judgment of his peers (condemnation to death) or by the law of nature (by illness or accident')." McMahon, *supra,* p. 6, sec. 10. *See* Holt, *Magna Carta* (Cambridge University Press, 1965), 1215 version, ch. 39, pages 326 and 327, and 1225 version, ch. 29, page 355.

parte Lawlor, cited at p. 274, Vol. 2, Decisions of Courts.

"As a fact, the . . . Court cannot condemn the Coroner for an omission of duty when he has performed his duty. Neither can it force him to summon a jury when the law obliges him to swear that he has good reason to believe that there has been homicide, when in conscience he can swear nothing of the kind." (p. 281, sec. 650.)

Our statute is an unusual one. The briefs cite no other state which confers authority upon the district attorney to compel the coroner or medical examiner to commence an inquest. Milwaukee is the only county of the state that employs a full-time medical examiner, who has the authority and duty of coroners in other counties. An article, *The Wisconsin Coroner System,* appearing in 1951 Wis. L. Rev. 529, pointed out the deficiencies of the coroner system as it then existed in most Wisconsin counties. Most coroners, the article pointed out, lacked the essential qualifications to deal with an inquest to determine the cause of death.

No doubt, the district attorney as a responsible constitutional officer, a man of professional training and acknowledged intellectual attainments, was given the duty by statute, ch. 314, Laws of 1905, to initiate inquests in an effort to ameliorate the conditions that arose from the inability to secure, generally at least, physicians or well-qualified investigators to serve as coroners.

It would seem strange that the legislature would select a responsible officer to supervise what at common law was a highly discretionary function and then strip him of all discretion. We conclude that the legislature did not intend to set an objective standard that any fact or circumstance was sufficient reason for the district attorney to believe that there had been criminal activity resulting in a death and thereby requiring him to call an inquest. The district attorney was no doubt selected by the legislature to make this determination because, with his experience and training, he could make the subjective judgment required by the statute.

This, of course, is not to say that his decision may rest upon prejudice or caprice. Discretion of a limited nature is conferred upon him by this statute, and there must be evidence that discretion was in fact exercised. There is evidence in the record of the exercise of such discretion.

The supplement to the district attorney's motion to quash, and which is a part of the record, is an affidavit of an experienced deputy district attorney detailing the investigation made by the officer and indicating why there was no reason to believe there was evidence of criminal activity or of unexplained or suspicious circumstances. While this court, were it acting *ab initio*, would not have necessarily followed the course of action adopted by the district attorney, the record is replete with evidence that the facts were carefully examined and the district attorney in the exercise of his discretion determined that there was no reason, in light of the circumstances, to believe that the death was the result of homicide in any degree or the result of unexplained or suspicious circumstances.

We believe that the trial judge was correct when he stated that holding the inquest would have had a salutary effect upon the community,

". . . and for the further and better reasons of community good and in the interest of justice, and to bolster the public's confidence in the police system, and for the further reason that the public has a right to know all the facts and circumstances surrounding a shooting in a police station."

While we agree with the sentiments so expressed, and join in them, they do not constitute a basis for requiring the district attorney to order an inquest when in the proper exercise of his discretion he has determined not to. To issue the peremptory writ under the facts as they appear in this record was in itself an abuse of discretion.

While ordinarily a motion to quash an alternative writ of mandamus is treated as a demurrer, and if sustained entitles the petitioner after a decision on the law to plead over, but if denied affords the movant the right to file a return to show factually the proper exercise of discretion, we believe that to permit repleading here would be superfluous. The affidavit of Deputy District Attorney Ben J. Wiener was made a part of the record and was referred to by both the parties on appeal. It served the function of a return for it "showed cause" why the district attorney exercised his discretion not to order an inquest. It sufficiently states the position of the district attorney and the factual posture of the case to show that discretion was in fact exercised and hence permits the appellant to prevail on the merits.

*By the Court.*—Judgment reversed, and the cause is remanded for the purpose of permitting the trial court to enter an order granting the defendant's motion to quash the alternative writ.

BEILFUSS, J. (*concurring*). I agree that the petition for mandamus should be dismissed. I have no quarrel with the majority opinion. In my belief there is another and equally compelling reason.

In counties with a population of over 500,000 the legislature has given all of the duties and responsibilities of the district attorney in inquests into death to the county medical examiner.

Sec. 966.15, Stats., provides:

"**Inquests; counties over 500,000.** In each and every county whose inhabitants exceed in number 500,000 *all the duties* mentioned in the foregoing sections of this chapter shall be performed by the medical examiner appointed pursuant to s. 59.34 (1), who is hereby invested with the *exclusive jurisdiction and power* to take inquests therein, and in case of the inability of the medical examiner to attend to such duties the medical examiner may

deputize one of his assistants to conduct the inquest."
(Emphasis added.)

I am authorized to state that Mr. Justice ROBERT W.
HANSEN joins in this concurrence.

WILKIE, J. (*dissenting*). The majority and the con-
curring opinions work at cross purposes. The majority
opinion builds up the authority of the district attorney to
decide whether or not a coroner's inquest should be
called. In effect, it strips the courts of any review of the
district attorney's decision not to order an inquest, pro-
vided that he demonstrates that he exercised his discre-
tion in reaching that decision. However, the concurring
opinion would hold that under sec. 966.15, Stats., the
district attorney in Milwaukee county has no function in
the ordering of inquests, that function having been as-
signed to the medical examiner (which office for Mil-
waukee county takes the place of coroner in the other 71
counties).

In my view, both the majority and concurring positions
are incorrect. All agree that we are concerned here
with construing and applying the provisions of ch. 966,
Stats., and in particular, sec. 966.01, which spells out
the responsibility and authority of the district attorney
in the ordering of coroner's inquests. As pertinent, that
section provides:

"966.01 **Inquests.** Whenever the district attorney has
notice of the death of any person and from the circum-
stances surrounding the same there is any reason to be-
lieve that murder, manslaughter, homicide resulting from
negligent control of vicious animal, homicide by reckless
conduct, homicide by negligent use of vehicle or firearm,
or homicide by intoxicated user of vehicle or firearm may
have been committed, or that death may have been due to
self-murder or unexplained or suspicious circumstances,
and the venue of such offense is in his county, excepting
in cases where a criminal warrant or warrants have been
issued, he shall forthwith order and require the coroner,
deputy coroner, or in the event of the absence or dis-

ability of the coroner or deputy coroner, some municipal justice to take an inquest as to how such person came to his death. . . ."

It could be argued that the majority has put the word "good" back in the statute. In 1957 the legislature changed the wording of sec. 966.01, Stats., by changing the word "good" in the phrase "good reason to believe" to the word "any" in the statutory section as it now provides: "any reason to believe." [1] If this were all that the majority opinion did, then the court would have to hold that the district attorney was required to order an inquest if there was any "good reason to believe" that circumstances existed calling for an inquest. In that situation, the court could review the evidence to determine whether there was, in fact, good reason to believe that circumstances existed which would require the district attorney to order an inquest. But this is not what the majority opinion has held. It has reached the conclusion that the district attorney's decision as to whether there is "any reason to believe" is a matter entirely within the discretion of the district attorney. In reaching this conclusion the majority has held that there can be no abuse of discretion so long as there is a "record of the exercise of discretion." In other words, there can be no abuse of discretion under this statute as long as there is a record of the district attorney's investigation concluding that there is "no reason to believe" that circumstances exist under which an inquest should be called.

Thus, the majority does not review the circumstances surrounding the death, but merely determines whether the district attorney made an investigation. In so doing, the majority would provide no review by a court of law of the matter of whether, in fact, the district attorney has failed to order an inquest when there is "any reason to believe" that circumstances listed in the statute exist which require the calling of an inquest. The statute does

[1] Ch. 128, sec. 1, Laws of 1957.

not give the district attorney the sort of discretion spelled out by the majority. The district attorney has wide discretion on matters affecting coroner's inquests, but that discretion comes into play after the inquest has been held. The district attorney is not obligated to prefer the charges recommended by the inquest. There are other examples in which the district attorney is vested with wide discretion in the decisions he reaches. One is provided by sec. 52.23, Stats., which provides that ". . . the district attorney, if he determines it to be to the best interest of the child" shall prosecute the paternity proceedings commenced by the mother of such child.

The concurring opinion misreads sec. 966.15, Stats. It fails to note that the medical examiner is "invested with the exclusive jurisdiction and power to *take* inquests" in Milwaukee county. (Emphasis added.) We are not concerned with taking inquests, but ordering them. The purpose of sec. 966.15 is clearly to provide that the functions normally vested in a coroner in the other 71 counties are assumed by the medical examiner in Milwaukee county. The function of the district attorney under sec. 966.01 in investigating and ordering inquests remains unchanged and the provisions of sec. 966.01 are just as binding as to the district attorney of Milwaukee county as to the district attorneys in other counties. The concurring opinion would substitute the words "medical examiner" for the words "district attorney" in sec. 966.01. Thus the medical examiner would be authorized to order himself to take an inquest. This cannot be what was intended by the legislature.[2]

For the reasons indicated, I would affirm the lower court's decision directing the district attorney to hold an inquest into the death of Jerome Kurkierewicz, as pro-

___

[2] In fact, sec. 59.456 (6), Stats., provides, as to counties of more than 500,000 population, "It is the responsibility of the district attorney . . . to perform all appropriate duties and appear whenever he may be designated in matters within chs. 292, 958, 964, 965, and 966. . . . ." Enacted by ch. 271, Laws of 1965.

vided for by sec. 966.01, Stats. Even though the shooting might have been in self-defense, unless under all of the circumstances surrounding the death it is apparent that no other reason for the death could exist, the district attorney is obligated by sec. 966.01 to order an inquest. As petitioner contends, the fact that the deceased was using a table knife with a round edge, the fact that no other attempt was made to stop the deceased, and the fact that the officer did not shoot Jerome in the arm or leg, but shot him in the head and chest, indicate that self-defense is not the only reason which might be attributed to the shooting. These argued facts indicate that the statutory standard, set forth in sec. 966.01, was not followed by the district attorney, and that an inquest should have been ordered.

Of course, the mere holding of an inquest under sec. 966.01, Stats., does not imply that a crime has been committed. It merely indicates that there may be reason to believe that one has been committed. The whole purpose of the inquest is to inquire into all of the circumstances surrounding the death with a view to ascertaining whether a crime has been committed. As the majority correctly states, the office of district attorney is invested with wide discretion in the performance of its numerous duties. But, also as the majority correctly notes: "There is . . . no basis for holding that his duties in representing the state are not subordinate to legislative direction as to the cases in which he shall proceed." [3] The legislature has precisely spelled out the duties of the district attorney in connection with the ordering of coroner's inquests. The district attorney in this case has not carried out these functions in accordance with the statute and has been correctly directed to order an inquest.

[3] *State v. Coubal* (1946), 248 Wis. 247, 257, 21 N. W. 2d 381.